# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3908
No. 04-3909

_____

Same Day Surgery Centers, L.L.C.,  *
             *
  Plaintiff - Appellant/   *
  Cross Appellee,     *
             * Appeals from the United States
  v.          * District Court for the
             * District of Minnesota.
Montana Regional Orthopedics, L.L.C., *
             *
  Defendant - Appellee/   *
  Cross Appellant.     *

_____

Submitted: September 12, 2005
Filed: December 30, 2005

_____

Before LOKEN, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

LOKEN, Chief Judge.

  Montana Regional Orthopedics (MRO), an orthopedic physician group practicing in Missoula, Montana, hired Minnesota-based Same Day Surgery (SDS) to construct, equip, and manage an ambulatory surgical center in Missoula. After SDS substantially completed the facility in June 2001, MRO denied demands for final payments. SDS commenced this diversity action for breach of two contracts, and MRO asserted breach of contract counterclaims. After a bench trial, applying

Minnesota law, the district court[1] rejected SDS's primary claim for reimbursement of expenses invoiced by third party vendors, finding that SDS failed to prove that the amounts it paid vendors exceeded MRO's contract payments to SDS for this purpose. The court upheld two of SDS's lesser contract claims, rejected MRO's counterclaims, and entered judgment for SDS in the amount of $23,840.44, plus statutory prejudgment interest and contract-based attorneys fees. SDS appeals the rejection of its main claim. MRO cross-appeals the rejection of one counterclaim. We affirm.

## I.

The parties' relationship was reflected in a Development Agreement signed June 1, 2000, and a Management Agreement signed July 1, 2000. Only the Development Agreement is at issue on appeal. Under that Agreement, SDS agreed to purchase real estate, design and construct the surgical center, purchase and install necessary equipment, supervise selection of the nursing staff, and obtain certifications and licenses. MRO agreed to reimburse SDS for costs and expenses incurred and to pay SDS a "Development Fee" of $457,500. The Agreement provided that the total Project costs including the Development Fee "will not exceed $2,042,603."

Construction of the surgical center began in late October 2000. MRO physicians saw their first patient at the facility in early March 2001. The surgical center received provisional accreditation as an approved Medicare facility effective June 18, 2001, which the parties agree was the Substantial Completion date under the Agreement. During these phases of the Project, MRO made four progress payments of $430,000 each, not always in response to SDS invoices. MRO paid SDS a total of $1,857,006 under the Development Agreement. On January 30, 2002, SDS sent

---

[1]The HONORABLE FRANKLIN L. NOEL, United States Magistrate Judge for the District of Minnesota, presiding with the consent of the parties pursuant to 28 U.S.C. § 636(c).

-2-

MRO a final invoice of $246,007.62, an amount that exceeded the contract cap by some $60,411. MRO refused to pay any part of that invoice. This lawsuit followed.

At trial, SDS conceded that MRO had paid the entire $457,500 Development Fee but claimed that invoices received from third party vendors put the total Project costs in excess of the $2,042,603 cap. Therefore, SDS argued, MRO owed an additional $185,597 for unreimbursed vendor expenses. SDS calculated its claim by subtracting the $1,857,006 paid by MRO from the contract cap. In support of the claim, SDS introduced vendor invoices (which it did not include in the record on appeal); Exhibit 4, a summary exhibit showing $1,561,820.59 in vendor invoices received by SDS; Exhibit 6, a summary exhibit showing a total of $1,185,904.94 paid by SDS to vendors; and testimony by Margaret Olin, a partner in SDS, explaining which entries on Exhibit 4 and Exhibit 6 were included in the $185,597 claim.

There was also trial testimony that SDS experienced financial difficulty during and after completion of the surgical center Project. Olin testified that she negotiated invoice reductions with some vendors and paid some vendor obligations with personal checks, and that one or two vendors had sued SDS and obtained money judgments. MRO's chief executive, Ronald Peterson, testified that MRO paid some vendors directly to maintain needed relationships. Despite this episodic testimony, neither party introduced probative evidence as to the status of vendor claims, nor did SDS represent that monies it collected on its claim would be paid to vendors.

## II.

On appeal, SDS argues that MRO received the full benefit of its bargain, SDS presented evidence that it has incurred liabilities which exceed the contract cap, and therefore SDS was entitled to payment of the full $2,042,603 cap. In response, MRO argues that the trial evidence proved that SDS's payments to vendors plus its Development Fee were substantially less than the $1,857,006 paid by MRO under the

Agreement. Therefore, MRO does not owe SDS the claimed $185,597. Rather, SDS owes MRO for its "overpayment" of reimbursable vendor expenses. These competing contentions require a closer look at the payment provisions in the Development Agreement. The interpretation of these provisions is a question of law we review *de novo*. See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 311 (Minn. 2003).

Section 2 of the Development Agreement is entitled "Development services to be provided by [SDS]." It contains two relevant provisions:

> 2.2.3 Construction. . . . [SDS] will enter into appropriate agreements with the general contractor and/or other parties for construction of the Project. . . . [MRO] shall pay when due or promptly reimburse [SDS] for all amounts payable under such construction contracts.

> 2.2.4 Equipment Selection and Purchasing. . . . [SDS] will coordinate the purchase and arrange for delivery and installation of all capital equipment, instruments and supplies necessary for operation of the Project through national vendors selected by [SDS] . . . . [SDS] shall enter into appropriate agreements . . . for the purchase of such equipment, instruments and supplies. [MRO] shall pay when due or promptly reimburse [SDS] for all amounts payable under such agreements.

Section 4 of the Agreement is entitled "[SDS's] Fees and Expenses" and contains what the parties consider the most relevant provision:

> 4.3 Direct Expenses. In addition to fees payable to [SDS], [MRO] shall reimburse [SDS] for certain direct expenses advanced by [SDS] . . . except where such expenses are expressly stated to be the responsibility of [SDS]. . . . Direct expenses shall include out-of-pocket disbursements, including but not limited to . . . fees or charges advanced

to other parties. . . . [SDS] shall send invoices . . . for its direct expenses on a monthly basis during the development of the Project and [MRO] shall pay such invoices within ten (10) days of receipt. Any amounts remaining unpaid . . . shall be due and payable in full at Substantial Completion.

Finally, Section 5 of the Agreement is entitled "[MRO] Responsibilities" and contains the following provision:

5.4 Equity/Loan Funds; Payment Obligations. . . . [MRO] shall pay when due all amounts to be paid to any third party in connection with the development of the Project, regardless of whether [SDS] or [MRO] entered into the contract with such third party, unless the obligation to pay such amounts is expressly stated herein to be that of [SDS].

The critical issue, as framed by the parties, is whether these provisions, and particularly § 4.3 with its use of the word "advanced," limit MRO's reimbursement obligations to amounts SDS has in fact *paid* to the third party vendors in question. At trial, SDS's Olin conceded that this was the course of dealing contemplated by the parties at the outset of the Project. But SDS nonetheless argues that, as a matter of contract interpretation, it incurred "direct expenses" triggering MRO's obligation to reimburse whenever a third party vendor *invoiced* SDS for goods or services the vendor in fact provided to the Project, regardless of whether SDS paid the vendor. The term "advanced" in § 4.3, SDS explains, is not a requirement that SDS advance payment to the vendor before seeking reimbursement from MRO. Rather, it simply refers to the fact that SDS "advanced" the vendor's goods and services to the Project before SDS sought reimbursement by MRO. SDS suggests the provision in § 4.3 that direct expenses "*include* out-of-pocket disbursements" confirms that the parties intended that the term "direct expenses" be broadly construed to reflect the principle "that MRO should pay for the benefits it indisputably received." The district court's

contrary interpretation of § 4.3, SDS complains, is inconsistent with MRO's clear obligation to pay amounts due third party vendors under §§ 2.2.3, 2.2.4, and 5.4.

MRO argues that the plain and unambiguous meaning of § 4.3 is that SDS must "advance" money to the vendor to trigger MRO's obligation to reimburse SDS for a "direct expense." But § 4.3 must be read in conjunction with §§ 2.2.3, 2.2.4, and 5.4, which provide that either SDS or MRO may contract with third party vendors and obligate MRO to pay or reimburse SDS for amounts owed to vendors "when due." Taken together, these provisions made the contract ambiguous in the sense that they left the parties flexibility in dealing with third party contractors and suppliers. Thus, as the district court recognized, extrinsic evidence was needed to determine whether SDS was entitled to be reimbursed for a particular vendor invoice. See Noreen v. Park Constr. Co., 96 N.W.2d 33, 36 (Minn. 1959).

SDS's Olin testified that the parties expected SDS to pay vendors before being reimbursed by MRO, even though MRO made four substantial progress payments during the construction phase without requiring detailed invoices from SDS.[2] This was a logical course of dealing. Because SDS chose the vendors, contracted with the

---

[2]At trial, MRO's Peterson testified that MRO sent SDS regular progress payments without requiring SDS to prove vendors had been paid. The court noted that this practice undermined MRO's argument that SDS payment to the vendor was a condition precedent to reimbursement:

> THE COURT: Let me interrupt for a second. I'm confused. You say you didn't get monthly invoices from Same Day for direct reimbursement pursuant to Section 2.3?
> THE WITNESS: I got some, but I did not get all of them.
> THE COURT: Well, how did it come that you paid them money?
> * * * * *
> THE WITNESS: I was paying in good-faith, assuming that the expenses existed–

vendors, and was in charge of constructing and equipping the facility, a vendor payment by SDS confirmed to MRO that the vendor had delivered proper goods or services at the proper price and that the vendor's invoice was "due" to be paid or reimbursed. But we reject MRO's contention that this sensible expectation was an inflexible contract requirement. For example, if cash flow difficulties prevented SDS from paying a vendor for goods or services already provided to the Project, the contract would not bar MRO from paying the vendor directly, or from advancing funds to SDS to pay the vendor, to compensate the vendor for benefits it provided to MRO as facility owner. Cf. Mrozik Constr. Inc. v. Lovering Assoc., Inc., 461 N.W.2d 49 (Minn. App. 1990); Restatement (Second) of Contracts § 227(1) (1981).

At trial, rather than present detailed, vendor-by-vendor proof of its right to additional expense reimbursement, SDS introduced only summary exhibits and vague testimony describing what might be called the big picture. The evidence established that MRO paid SDS a total of $1,857,006, $185,597 less than the $2,042,603 contract cap. SDS paid third party vendors $1,185,904.94 and kept the $457,500 Development Fee. What SDS did with the remaining MRO proceeds was not explained. To put this evidence in perspective, we will assume that the total Project costs including the Development Fee exceeded the contract cap, as SDS alleged but arguably did not prove. Under the parties' course of dealing as described by Olin, SDS should have used the payments received from MRO to pay vendors what they were owed, applying any balance to the unpaid Development Fee. Then, when the Project was substantially completed, SDS would demand that MRO pay the balance of the Development Fee up to the contract cap. But SDS did not do that. Instead, it pocketed the entire Development Fee from MRO's progress payments, paid vendors less than they were owed, and then demanded after substantial completion that MRO pay additional reimbursement up to the contract cap.

In these circumstances, if MRO is held liable to SDS for the claimed additional reimbursement, the remedy would not benefit vendors, who on this record are the

truly aggrieved parties. Rather, the recovery by SDS would have the practical effect of increasing its Development Fee well beyond the agreed amount, $457,500. In our view, by no stretch of the imagination would this result be consistent with the Development Agreement. Therefore, the district court properly denied SDS's claim for $185,597 because SDS failed to prove that claim.

## III.

At trial, MRO alleged that SDS breached the Development Agreement by not timely completing the Project and breached the Management Agreement by failing to provide competent services. The district court rejected those counterclaims on the merits, rulings that MRO does not appeal. Based upon the trial evidence that SDS paid vendors less than the total amount MRO paid SDS, minus the Development Fee, MRO expanded its counterclaim to include a demand for a "refund" of its overpayments. MRO cross-appeals the district court's denial of that claim.

SDS presented evidence that MRO got the full benefit of its bargain. MRO did not refute that evidence. We agree with the district court that "the Parties' conflicting exhibits . . . are too confusing, and the testimony regarding them, too inconclusive to allow the Court to provide a precise accounting." In these circumstances, MRO may not rely on the inadequate proof that was insufficient to prove SDS's claim to justify a belated refund claim that MRO did not itself affirmatively establish.

The judgment of the district court is affirmed.

_____